# UNITED STATES DISTRICT COURT

for the District of Idaho Coeur d'Alene

| | | |
|---|---|---|
| Tony L. Rogers | ) | Case No. CV 18-475 CDCN |
| *Plaintiff* | ) | *(to be filled in by the Clerk's Office)* |
| -v- | ) | |
| | ) | U.S. COURTS |
| | ) | OCT 26 2018 |
| Washington State University | ) | Rcvd____ Filed____ Time 3:20 pm |
| *Defendant* | ) | STEPHEN W. KENYON |
| | ) | CLERK, DISTRICT OF IDAHO |
| | ) | FEE PAID |
| | ) | RCPT # IDZ000 1298 |

## COMPLAINT AND REQUEST FOR INJUNCTION

**I.     The Parties to This Complaint**

    **A.     The Plaintiff(s)**

        Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Tony Rogers |
| Street Address | P.O. Box 1843 |
| City and County | Lewiston |
| State and Zip Code | Idaho, 83501 |
| Telephone Number | (208) 274-0879 |
| E-mail Address | TonyRogers2Ch20@gmail.com |

    **B.     The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is a government agency, an organization.

| | |
|---|---|
| Name | Washington State University |
| Street Address | 332 French Administration Building |
| City and County | Pullman, Washington 99164-1031 |

## II.  Basis for Jurisdiction

1. Diversity of Citizenship: A matter between or corporate citizens of different of different states and the amount of controversy exceeds $75,000 (28 U.S.C. § 1332). I am a citizen of the State of Idaho and the amount in controversy exceeds $75,000. Washington State University is publically funded within Washington State.

2. Federal Question: Claim arises under The Constitution, laws, or treaties of the United States.
    a. Violation of Constitutional Rights (U.S.C. & 1983); Fifth and Fourteenth Amendments of the United States Constitution: Violation of Due process Rights and Violation of Equal Protection Rights.
    b. Violation of Title IX gender bias and retaliation. Defendant is a public school receiving federal funds.
    c. Violation of Title Vii gender bias, religious bias, and retaliation.
    d. I received a Right To Sue from the EEOC on July 31, 2018.

3. An appeal was filed with the State of Washington Personnel Board and mediation was granted between Mr. Rogers attorney and the State Attorney General Office which has authority of such was. This failed prior to mediation at the recommendation of the Attorney General as the amount in controversy listed in mediation statements, exceeded the amount offered.

## III.  Statement of Claim

1. After over 27 years of service with Washington State University, Mr. Tony Rogers was notified on August 24, 2017 by Ms. Holly Ashkannejhad, Assistant Director of the Washington State University Office for Equal Opportunity (hereinafter "OEO"), that an investigation involving two employees. Ms. Randi Aston and Ms. Shanna Rogers had been opened against him which contained no accusations of sexual comments, gestures, asking for favors whatsoever but revolved around religious issues, and false allegations involving dating. Although there was disparity of treatment regarding both and targeting Mr. Rogers for religious issues, and Mr. Rogers believes there was retaliation of OEO as a result of Mr. Rogers asking questions that revealed conduct of the investigators, the greatest disparity of treatment is the treatment Mr. Rogers compared to Shana Rogers previously known as Shana Slippy who Mr. Rogers supervised.

2. In lieu of a neutral investigation, OEO carefully selected the evidence it needed to build a case against Mr. Rogers, including omitting certain material facts, materially altering both verbal and written statements, neglecting witnesses, burying exonerating witness statements, made multiple false statements, and engaged in a reckless disregard for determining if statements were true or false, willfully did not investigate his written responses nor blatant inconsistencies and the alleged misconduct on the part of complainant(s).

3. Mr. Rogers case was gender biased, religiously biased retaliatory and included gross violations of due process. All of which heavily influenced Mr. Terry Boston, the appointing authority which lead to Mr. Rogers wrongful termination on April 19, 2018.

4. On January 19, 2018 Ms. Holly Ashkannejhad falsely represented that she had conducted a neutral fact finding investigation by issuing a finding. On March 22, 2018 after requesting a second time in an email if his responses to the complaints had been investigated, Ms. Ashkannejhad replied and acknowledged that Mr. Rogers responses were not investigated.

5. On March 15, 2018, Ms. Ashkannejhad indicated by email that she was the only one who put the findings together, reviewed, and approved her findings. The ultimate lack of oversight at the department level rests with Kimberly D. Anderson, J.D., Executive Director for Compliance for Washington State Office of Equal Opportunity.

6. The Department of Education, which provides for oversight, guidance and compliance regarding Title IX issues, provides, under Article 1, Section 101 of the OCR Case Resolution and Investigation Manual, that oral allegations that are not reduced to writing and signed are not complaints. https://www2.ed.gov/about/offices/list/ocr/docs/ocrcrm.html#I_1. The EEOC, The Washington State Human Rights Commision, The University of Washington and Western Washington University all require signed complaints.

7. In April 2018, Ms. Rogers insisted to her coworkers that she had not filed a complaint. Further, in an email dated April 3, 2018, the investigator acknowledged the complaints had not been reviewed and signed.

8. On August 29, 2017 Mr. Rogers requested in an email to Ms. Ashkannejhad if he or his attorney could provide a set of interrogatories but was denied.

9. At no time was either Mr. Rogers or his attorney allowed to cross examine in a hearing directly, through a neutral fact finder, or in writing.

10. Mr. Rogers was denied the protection of a recorded interview and as such was not interviewed. The only reason given was that it was OEO's standard operating procedure to not allow recorded interviews. As well he was not asked in writing to respond to any form to follow up questions for clarification.

11. The U.S. Department of Education which provides oversight, guidance and has power to sanction federally funded schools, allows for recorded interviews. Washington State University student conduct hearings which deal with far more sensitive issues are required to be recorded. Both employees and students are equally protected under Title ix, Title VI and Fifth and Fourteenth Amendments of the United States Constitution.

12. Unlike an investigation in 2016 in which a female employee filed a complaint against another female employee and misconduct was discovered on the part of the complainant, and openly revealed in a finding, in Mr. Rogers case, misconduct on the part of the female complainant(s) not limited to allegations of bullying on the part of Ms. Rogers to the point an employee moved to a different building, was buried by ignoring statements and materially altering written statements.

13. Unlike the investigation in 2016, which involved two female employees in which a preliminary report was issued to all parties, including supervisory staff, giving each person an opportunity to provide feedback as to the veracity of the finding and provide more information, no preliminary report was issued in Mr. Rogers case.

14. On June 15, 2017 Ms. Randi Aston asked Mr. Rogers to no longer call her ornery like a goat nor mom with regard to the younger workers. Mr. Rogers agreed and asked if she had any other concerns to which she said, "No". This was also reflected in her personal notes as being the case to Ms. Ashkannejhad. As such, her involvement was based upon her mistaken belief Ms. Rogers was not being deceptive and manipulating her.

15. Ms. Rogers and Mr. Rogers had been facebook friends for approximately three years and she on at least one occasion sent Mr. Rogers a message asking for prayer for family issues which he kindly said he would.

16. Mr. Rogers In need of help cleaning a resident hall which was without staff, Ms. Rogers who had previous experience was hired at the end of March as a temporary employee and then applied for staff and was hired.

17. At the start of Ms. Rogers employment, Mr. Rogers took Ms. Rogers to the Cougar Id center for an employee identification card. While walking down the hall after obtaining her card, Ms. Rogers mentioned that her last boyfriend struggled with weight issues, and was self conscious about it but it didn't bother her. Mr. Rogers thought she was just encouraging him as a christian friend and thought it very kind of her to treat her previous boyfriend the way she did. Around this same time, Ms. Rogers mentioned she was divorced and referred to her husband as her ex husband and changed her facebook status to reflect the same.

18. From April until middle of May, Ms. Rogers increased her dialogue toward Mr. Rogers on Facebook, and openly sought him out about her personal problems. Mr. Rogers listened and encouraged her.

19. Although Mr. Rogers and Ms. Rogers were not interacting in person outside of work, Executive police 28 for Washington State University, "SUPERVISOR-SUBORDINATE RELATIONSHIPS" States

    "Washington State University employees, regardless of position, rank, or professional relationship, may rightfully develop consensual relationships".

    as such Ms. Rogers seeking out Mr. Rogers over personal issues and interacting with him on facebook, texting him was within university guidelines. If she had asked him to get together outside of work as a friend for coffee, lunch, a bible study or prayer group...the same is true.

20. At no time did Mr. Rogers engaged in either a dating or a romantic relationship with Ms. Rogers, or Ms. Aston nor did he ask.

21. Mr. Rogers is open about his view that he'd prefer not to engage in dating unless he where to get to the know the person first through faith based activities and has written on his view well before this issue.

22. Mr. Rogers friends are not exclusively religious and two of his closes male friends are not, one of which he vacations with, is an agnostic. However, as his faith is major part of his life and the largest percentage of his social interactions throughout the week are faith based. This being the case, anyone he would engage in a dating relationship with, would be with someone who would enjoy those types of activities as well and would naturally exclude a married lady.

23. In middle of May it was revealed Ms. Rogers was still married when a male facebook friend posted on of Ms. Rogers facebook wall. "When are you going to come out and see me. When that idiot signs the final paperwork, I'm not going to take no for an answer".

24. The next day Mr. Rogers mentioned to Ms. Rogers, it looked like she had some creep following her on facebook. She responded that she did not know him. He had just friended her and she needed to block him. Later she responded to the post. "I'm not coming out. Don't post things like this. You need to message me".

25. Ms. Rogers had asked Mr. Rogers to pray with her, which they hadn't but he had agreed provided it was away from work and she was the one who invited him. With the new information that Ms. Rogers was in fact still married, Mr. Rogers kindly let Ms. Rogers know he refrains from praying privately with married ladies as there is the possibility that can cause wrongly placed affections but indicated he would be glad to join her if she had a group of people and he was invited him. Ms. Rogers asked if it would work if she texted him to join if she had a group, which he agreed that would work then showed him a list of people she was praying for. Mr. Rogers thought it interesting her list did not contain Ms. Aston as a couple weeks earlier she had asked him to pray specifically for her and Ms. Aston now seemed off her radar.

26. During the week of June 7, 2017 Ms. Rogers appeared to be upset with Mr. Rogers and he noticed she had deleted him from facebook and met with her briefly to inquire if he'd done anything to upset her. She expressed, "I get the impression you want to date me and I'm married". Mr. Rogers assured her that was not the case, and reminded her that he won't even pray privately with a married lady which she stated she remembered, that he can't date people on his crew and won't date anyone unless he got to know the person as a friend first through church. Ms. Rogers respond with a jealous tone saying, "Well what are you going to do fire her so you can date her", when she thought Mr. Rogers might be interested Ms. Aston, which he had not stated to her. Ms. Rogers then caught him off guard when she spontaneously hugged him.

27. All of this confused Mr. Rogers as on the one hand she seemed upset thinking he wanted to date her, on the other, she had just made a very jealous comment when she thought he wanted to date someone else. Three days later Ms. Rogers refriend Mr. Rogers on Facebook which he accepted.

28. During the week of June 14, 2017 Mr. Rogers noticed she once again appeared to be upset with him and assured her again he was not seeking to date her. Ms. Rogers then blocked him on facebook and allegedly, on June 21, 2017 Ms. Rogers told Ms. Aston she was afraid of Mr. Rogers and feared for Ms. Aston's safety around Mr. Rogers and asked Ms. Aston to be extra careful. Allegedly she also told Ms. Aston she had switched from a 7:00 am to 5:30 pm shift to a 7:00 am to 3:30 pm shift [June 12] so she would not be alone with Mr. Rogers in the building. Mr. Rogers had a major deep cleaning project in her building through the end of June with summer workers working 7:00 am to 5:30 pm, she never was alone in the building.

29. The first part of August Mr. Rogers met with Ms. Rogers again and her coworker Ms Frazier. Ms. Frazier had worked with Mr. Rogers for years, knows him to be honest and she had known Ms. Rogers for years and thought it wise to have her there and told them both he was not interested in pursuing a dating relationship with Ms. Rogers and that he was very frustrated by the rumor. Ms. Ashkannejhad acknowledged this took place but stated Ms. Rogers did not believe Mr. Rogers to be sincere.

30. On August 24, 2017 Mr. Rogers in an initial response, provided Ms. Ashkannejhad two text messages from June 26 and June 27. On the 26th, Mr. Rogers is responding back to a photo Ms. Rogers sent him of the outside entrance of her building she had cleaned. He replied, "Beautiful. Thank you so much. You can't imagine the stress off my shoulders as your supervisor knowing you care so much about your building. I haven't felt so good about [her building] in years". The text on the 27 has Ms. Rogers reaching out for emotional and spiritual comfort as she had all spring, this time over the death of cousin, and her own personal spiritual concerns and thanking him for getting to her so quick the day before when she was frightened by a man she encountered outside her building, five days after allegedly telling Ms. Aston she was afraid of Mr. Rogers and had told Ms. Aston to be extra careful around him, and in direct contradiction to Ms. Rogers alleged complaint stating he threatened her job and had asked her personal questions. Mr. Rogers was unaware of this exchange between Ms. Rogers and Ms. Aston until January 2018.

31. Ms. Ashkannejhad's falsely indicated these text messages and just as exonerating facebook screenshots which were to follow were were merely nice exchanges and discounted the one from June 26 as it did not capture the date stamp, which she had five months to ask for but did not.

32. Mr. Rogers is concerned that Ms. Ashkannejhad may have intentionally kept this evidence of Ms. Rogers intentionally manipulating and inciting Ms. Aston from her, leaving Ms. Aston believing a lie and having been manipulated for over a year. A neutral investigator, would have sought to investigate inconsistencies, which having not investigated Mr. Rogers responses, it is clear Ms. Ashkannejhad had no interest in doing.

33. On 9/7/2017 Ms. Ashkannejhad interviewed Nanna Frazier, Ms. Rogers' coworker and asked if she had ever heard of Mr. Rogers threatening Ms. Rogers job to which Ms. Frazier stated "no" and that would not make any sense as he was always talking about what a blessing it was to have Ms. Rogers and Ms. Frazier working in the building together. This information was hid from Ms. Ashkannejhad findings.

34. On 9/8/2017 Ms. Ashkannejhad asked Susan Mays to tell all the rumors about Mr. Rogers as rumors lead to truth, did not do the same with regard to Ms. Aston or Ms. Rogers and became visibly upset with Ms. Mays when she refused as she believed it to be a biased and unprofessional question. Ms. Ashkannejhad then kept twisting Ms. Mays words and Ms. Mays had to keep correcting her.

35. Ms. Mays provide two witness Elise Moody and Courtney Kimberling as they had both worked in Ms. Rogers building during the summer. Ms. Ashkannejhad neglected these witnesses until Mr. Rogers attorney alerted her in an email that he would be conducting an investigation and providing witness statements.

36. Ms. Mays informed Ms. Ashkannejahad that Ms. Rogers had flipped out and started falsely accusing her of things she had not done including accusing Ms. Mays of sending her mean text messages about her grandson which she had not done and could not show Ms. Mays when asked, and as a result she stopped giving Ms. Rogers rides to work. This same information was provided in a follow up statement.

37. Ms. Ashkannejhad altered Ms. May's statement into her findings to read Ms. Mays stopped giving Ms. Rogers rides to work over a property disagreement and further when Ms. Mays informed her she had known Ms. Rogers since they were kids and she is very deceptive, and had has falsely accused others including her previous manager, and accused an ex boyfriend of strangulation and the case was dropped[by motion of the prosecutor] and afterward purportedly solicited people to beat up her ex boyfriend, this was kept from her report.

38. On 9/27/2017 Ms. Ashkannejhad falsely stated to Courtney Kimberling that nothing she was saying was helpful to investigation when in fact unknown to Ms. Kimberling, what she told Ms. Ashkannejhad was materially

significant. Ms. Kimberly told Ms. Ashkannejhad that Ms. Rogers talked about all her personal problems openly all the time, including family drug problems, was often arguing with her husband on the phone and told her she planned to divorce her husband on their wedding anniversary. Ms. Rogers complaint listed Mr. Rogers asked her personal questions, and Ms. Ashkannejhad report released in January indicated that Ms. Rogers could not figure out why Mr. Rogers would think she was single as they had been facebook friends and plastered it all over facebook that she was married and loves her husband.

39. On October 25, 2017 at 2:28 pm, Ms. Ashkannejhad was provided witnesses statements, Mr. Rogers written responses, exonerating screenshots of facebook pages, and text messages. Violating standard operating procedures for conducting a neutral fact finding investigation Ms. Ashkannejhad, willfully chose not to investigate Mr. Rogers responses. Instead she sought to solicit another complaint against Mr. Rogers listing that Mr. Rogers targets hiring Christians, despite already having ample evidence Mr. Rogers has a diverse crew and actively encourages temporary staff to apply for staff regardless of being religious or not and actively encourages staff to apply for promotional positions regardless of faith.

40. In contrast, when both verbally and in a statement, Elise Moody stated she had been bullied by Ms. Rogers to the point, she moved to a different building this was hid from the findings and no complaint was sought against Ms. Rogers.

41. In October Ms. Rogers worked a few days past her 6 months trial service said she hurt herself at work, and went out on medical.

42. In November of 2017, while out on medical, and physically separated from her husband, Ms. Rogers went through the five steps of unblocking Mr. Rogers on facebook and again listed herself as single.

43. In April, while out on medical Ms. Rogers posted on facebook, that she was working elsewhere. When this became public knowledge, she deleted, Ms. Mays from facebook, obtained a medical note to return to work and made wildly false accusations to Ms. Frazier that Sue Mays was taking meth.

Mr. Terry Boston, the hiring authority for Mr. Rogers department, further engaged in gender-based discrimination against Mr. Rogers when he:

1. Favored complainants over Mr. Rogers despite being given substantial evidence including Ms. Rogers having a pattern of deception, making false and retaliatory statements, evidence of having fraudulently used sick, had been working elsewhere while out on a medical claim, suggesting a general character of dishonesty.

2. Took no action against Ms. Rogers for spreading false rumors that Mr. Rogers was seeking to date her, a married woman, but fired Mr. Rogers despite the fact the Mr. Rogers assured Ms. Rogers on three separate occasions that

he was not interested in her once with a witness. Mr. Boston's willful indifference to Ms. Rogers' conduct and contrasting termination of Mr. Rogers shows a clear gender bias.

3. Made false and belittling statements against Mr. Rogers in his termination letter.

4. Mr. Boston wrongly stated Mr. Rogers said he asked Ms. Rogers on a date, despite being told very clearly verbally, in writing twice that was not the case which was also very clearly covered in Mr. Rogers responses which Mr. Boston was provided.

5. Despite having received a forwarded email from the Ms. Ashkannejhad stating that Mr. Rogers written responses were not investigated, and Mr. Rogers covering this as first importance both verbally and in the first paragraph of a packet he provided Mr. Boston on March 27, 2017, Mr. Boston stated he saw no reason to believe the investigation was biased. As well, Mr. Boston was alerted in an email that Mr. Rogers had contacted the EEOC as he believed his civil rights had been violated.

6. Mr. Boston also showed total disregard for the professional opinion of counselor Mr. Rogers sought out as Mr. Rogers wished to develop some better boundaries and protection for himself while still being willing to listen to people who sought him out.

In the formal meeting with Mr Boston on March 27, 2018 Mr. Rogers presented the following.

1. Ms. Rogers had falsely stated she was single.

2. Ms. Rogers had falsely accused her previous manager in January of 2017, three months prior to coming to work for Mr. Rogers.

3. Accused a ex boyfriend of trying to strangle her and the case was dismissed by motion of the prosecutor.

4. Purportedly had people beat up her ex boyfriend after the case was dismissed.

5. That Contrary to her false accusation to the investigator that Mr. Rogers wanted to date her, and should have known she was married because of her facebook status, Mr. Boston was shown that she frequently changes her relationship status on facebook, which she once again started to do two weeks after Mr. Rogers was alerted as to the investigation in which she listed herself as separated, divorced then in November of 2017 she went through the fives steps of unblocking Mr. Rogers and listed herself as single and was and still is married and had not deleted posted she had made just tagging Mr. Rogers.

6. That contrary to Ms. Rogers assertion that Mr. Rogers was pursuing her since April, he showed Mr. Boston screenshots of Ms. Rogers pursuing Mr. Rogers in dialogue on facebook, including making posts on her own account and tagging just Mr. Rogers.

7. Mr. Boston stated he knew little about Facebook then belittled Mr. Roger for gathering evidence that would exonerate himself.

8. Emailed Mr. Boston evidence that Ms. Rogers was fraudulently working outside of WSU while out on a medical claim and Mr. Boston took no action.

9. Was made aware Ms. Rogers had fraudulently used sick leave to watch the eclipse and falsely stated Mr. Rogers had not brought this to his supervisor's attention.

10. That Ms. Rogers had been deceptive with a Moscow Idaho police officer when he questioned her about her attempt to pass two of her own date alter prescriptions for methadone on the same day.

11. That she had been deceptive with a Moscow Idaho police officer when he questioned her regarding a suspected spotting scope she sold to the Moscow Idaho Pawn store stating she received it in payment from an unknown man who owed her a debt.

12. Was provided an email from Ms Moody stating that Ms. Rogers had been parachuting at least two just smaller than ping pong ball size balls of Kratom at work, a natural herb that according to Narconon overdoses can cause delusional thinking and according to the FDA in February of 2018 Kratom contains psychoactive chemicals. He then falsely accused Mr. Rogers of not bring this to the attention of supervisor. It was made very clear to Mr. Boston that Human Resource Services itself focuses on employee incapacity to perform work when it comes to suspected of alcohol or drug use.

13. That Ms. Rogers had made wildly false accusations to Ms. Frazier at work that Ms. Mays was taking meth, which he received email confirmation of.

14. That Ms. Rogers falsely told Ms. Aston that she was afraid of Mr. Rogers while in fact she was seeking out Mr. Rogers and was shown text messages from June 26, 2017, and June 27, 2017 showing this along with Ms. Rogers seeking him out personal reasons and when she is afraid and contrary to her saying he had threatened her job, a text message from June 26, 2017 praising her work.

15. Had stated she loves her husband but had told Courtney Kimberly she planned to divorce him on their wedding anniversary.

16. That contrary to Ms. Rogers complaint that Mr. Rogers made the comment women are Tattered and Torn and it offended her, Mr. Boston was shown a screenshot where Ms. Rogers borrowed that from, a poem Mr. Rogers had written and posted in which she hearted and commented, "Perfect".

17. That Ms. Rogers had flipped out and started falsely accusing Ms. Mays of saying mean things about her grandson which resulted in Ms. Mays stopping giving her rides to work.

18. Showed Mr. Boston that contrary to the false allegation that Mr. Rogers had threatened Ms. Rogers job, Mr. Rogers had invited his supervisor to her building to show him the wonderful job she was doing, and just prior to the building opening on approximately August 11, had worked with Ms. Rogers and Ms. Frazier to develop a welcome to the hall letter for the incoming residents introducing both Ms. Frazier and Ms. Rogers and had released her from needing a lead.

Mr. Tattershall voiced a concern to Mr. Rogers in an email regarding the workload of Ms. Aston and kind of functioning like a supervisor. Ms. Aston normally is lead just over her building but when there are temporary employees or new staff needing trained in other buildings without a lead she graciously takes on that task and due

to a lack of staff and a major deep cleaning project in Ms. Rogers building, Ms. Aston hadn't had a break to focus just on her building in months.

19. Mr. Boston was cautioned by Robert Tattershall, the Director of Housing Services that Mr. Rogers had put forth credible evidence that illustrated Ms. Rogers was being deceptive including to Ms. Aston and if Mr. Boston terminated Mr. Rogers he believed strongly it would result in a court case against Washington State University.

20. Despite all the above Mr. Boston, took the word of Ms. Rogers over Mr. Rogers and stated public records were not relevant to how Mr. Rogers was supposed to treat her, fired Mr. Rogers and took absolutely no action against Ms. Rogers making false allegations against Mr. Rogers stating he wanted to date her, making false accusations about Ms. Mays, inciting Ms. Aston and working outside of WSU while out on medical.

## IV.  Irreparable Injury

1. Mr. Rogers is requesting that the court order Washington State University to order the gender biased, religious biased, case findings, notes of the investigator(s) against Mr. Rogers destroyed.

2. Mr. Rogers termination letter be destroyed.

## V.  Relief

Mr. Rogers is seeking damages of $1,039,641 in present discounted value of lost compensation, benefits, and calculated retirement benefits and punitive damages for each violation of his rights, as the court determines is just.

## V.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause     unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a          nonfrivolous argument

for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

    **A.**    **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

    Date of signing:    10/26/2018

    Signature of Plaintiff    *Tony Rogers*
    Printed Name of Plaintiff    Tony L. Rogers